# 23-7549

## United States Court of Appeals for the Second Circuit

JOSEPH SROUR,

*Plaintiff-Appellee,*

*against*

NEW YORK CITY, NEW YORK, and EDWARD A. CABAN,

*Defendants-Appellants,*

KEECHANT SEWELL, in her Official Capacity as NYPD Police Commissioner,

*Defendant.*

On Appeal from the United States District Court for the Southern District of New York

## BRIEF FOR APPELLEE

THE BELLANTONI LAW FIRM
*Attorneys for Appellee*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
info@bellantoni-law.com

AMY L. BELLANTONI
March 13, 2024

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................... i

PRELIMINARY STATEMENT .............................................................. 1

*The New York City Administrative Code ("NYAC")* ............................. 1

*Title 38 of the Rules of the City of New York ("RCNY")* ...................... 2

*38 RCNY 3-03 "Grounds for Denial of Permit" (Rifles and Shotguns)* .................. 3

*The District Court Decision* .................................................................. 4

*The Amended Versions of the Rules Are Not Part of This Record* ............ 5

*The District Court Should Be Affirmed* ................................................ 6

*The City's Theories Are Meritless* ....................................................... 7

ABRIDGED FACTUAL AND PROCEDURAL BACKGROUND ...................... 8

SUMMARY OF ARGUMENTS ............................................................... 10

ARGUMENT ....................................................................................... 13

I. SROUR HAS ARTICLE III STANDING ............................................. 13

    A. Article III Standing Existed When the Complaint Was Filed ........... 13

    B. Srour Did Not 'Lose Standing' by Winning His Facial Challenge.... 15

    C. Srour's Post-Decision License Applications Are Outside of This Record and Sub Judice In A Separate District Court Case ................ 16

II. NYAC 10-303 IS A STATUTORY SCHEME CREATED BY AN ELECTED LEGISLATIVE BODY FOR LICENSING RIFLES AND SHOTGUNS; RCNY 3-03 ARE ADMINISTRATIVE RULES AMENDABLE AT THE WILL OF A POLICE COMMISSIONER ................................................. 17

    A.  New York Administrative Code .................................................... 17

    B. The Rules of the City of New York.................................................... 18

    C.  38 RCNY 3 Is An Administrative Policy of the Police Commissioner, Not an 'Implementing Regulation'....................... 18

    D.  When the District Court Struck NYAC 10-303(A)(2) As Facially Unconstitutional, 38 RCNY 3-03 Became a Nullity .................... 19

III.  THE DISTRICT COURT PROPERLY APPLIED THE *BRUEN* TEST AND REACHED A CONSTITUTIONALLY SOUND CONCLUSION ............. 21

    A.  Srour's Conduct Was Correctly  Deemed 'Presumptively Protected'............................................................... 22

    B.  The District Court Properly Found The City's Regulations Are  As Impermissibly Discretionary As The Now-Stricken 'Proper Cause' ................................................................................ 22

    C.  The Court Properly Found 10-303(a)(2) Vague and Overbroad.... 23

    D.  NYAC 10-303(a)(2) Addresses The Same Societal Problem As *Heller* and *Bruen*: "Handgun Violence in Urban Areas".............. 24

    E.  The Court Correctly Found That the City Improperly Placed The Burden on Srour.................................................................... 27

IV.  THERE IS NO HISTORICAL TRADITION OF LICENSING RIFLES AND SHOTGUNS -- IN THIS NATION OR NEW YORK STATE .................... 28

    A. No Tradition of Licensing Rifles and Shotguns........................... 28

B. Licensing Second Amendment Rights 'Appeared' Over 100 Years After the Ratification – And Only Applied To Handguns.............. 30

C. New York's Legislature Recognized That Licensing Rifles and Shotguns is Contrary to the Unfettered Right to Possess Rifles and Shotguns in This Nation............................................................ 31

V. *ANTONYUK* IS NOT DISPOSITIVE OF THIS APPEAL................................ 33

A. *Antonyuk* Involved the Interlocutory Appeal of a Preliminary Injunction of State Handgun Regulations...................................... 33

B. *Antonyuk* Involved a Challenge to Handgun Regulations .............. 35

C. *Antonyuk*'s Historical Analysis Is Constitutionally Unsound......... 36

D. The City Statute Is Distinguishable: NYAC 10-303(a)(2) Authorizes Unrestrained Discretion ................................................................... 37

VI. THE DISTRICT COURT'S HISTORICAL ANALYSIS WAS CONSTITUTIONALLY SOUND ........................................................... 38

A. The Plain Text of the Second Amendment Forecloses Discretion. 39

B. The Supreme Court Has Never Looked to Post-1868 Regulations as A Primary Means of Interpreting the Constitution ................... 40

C. Post-Ratification History is Consulted to Confirm Founding Era Meaning; But the Plain Text of the Second Amendment 'Controls' .............................................................................................. 42

D. The Exercise of Subjective Discretion Over Second Amendment Conduct Contradicts the Plain Text and Natural Law .................. 43

E. *Bruen* Rejected Discretionary Assessments .................................. 44

VII. THE CITY'S BALANCING OF 'COMPELLING PUBLIC INTERESTS' FLOUTS SUPREME COURT PRECEDENT ...................................... 46

CONCLUSION ........................................................................ 47

CERTIFICATE OF COMPLIANCE ..................................... 48

APPENDIX............................................................................ 49

New York State Governor's Bill Jacket, Senate Bill 136................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin*,
  754 F.2d 1015 (2d Cir.1985) .............................................................. 35

*Aguilar v. Texas*,
  378 U.S. 108 (1964) ........................................................................... 42

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023) ..........................................................10, 11

*Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*,
  732 F.2d 1095 (2d Cir.1984) .............................................................. 35

*Bach v. Pataki*,
  289 F.Supp.2d 217 (2003) ................................................................. 31

*Benton v. Maryland*,
  395 U.S. 784 (1969) ........................................................................... 42

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ........................................................................... 40

*Cayuga Indian Nation of New York v. Seneca Cnty., New York*,
  978 F.3d 829 (2d Cir. 2020) .............................................................. 35

*Chen–Oster v. Goldman, Sachs & Co.*,
  251 F.Supp.3d 579 (S.D.N.Y. 2017) .................................................. 14

*Citizens for a Safer Cmty. v. City of Rochester*,
  627 N.Y.S.2d 193 (Sup. Ct. 1994) ..................................................... 31

*Crawford v. Washington*,
  541 U.S. 36 (2004) ............................................................................. 42

*Davis v. FEC*,
  554 U.S. 724 (2008) ........................................................................... 14

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ..................................................................... Passim

*Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*,
  544 F.2d 571 (2d Cir. 1976) ................................................................. 35

*Duncan v. State of La.*,
  391 U.S. 145 (1968) ............................................................................. 42

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................. 14

*Goodheart Clothing Co. v. Laura Goodman Enters.*,
  962 F.2d 268 (2d Cir. 1992) ................................................................. 34

*Heller v. D.C.*,
  670 F.3d 1244 (D.C. Cir. 2011) ............................................................ 43

*Irish Lesbian & Gay Org. v. Giuliani*,
  143 F.3d 638 (2d Cir. 1998) ................................................................. 34

*Ker v. California*,
  374 U.S. 23 (1963) ............................................................................... 42

*Loria v. Gorman*,
  306 F.3d 1271 (2d Cir. 2002) ............................................................... 16

*Lower E. Side People's Fed. Credit Union v. Trump*,
  289 F. Supp. 3d 568 (S.D.N.Y. 2018) ............................................ 13, 14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 13, 14

*Mapp v. Ohio*,
  367 U.S. 643 (1961) ............................................................................. 42

*McDonald v. City of Chicago, Ill.*,
  561 U.S. 742 (2010) .............................................................. 24, 41, 42

*Nevada Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ........................................................ 42

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ..................................................... Passim

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
  596 F.3d 112 (2d Cir.2010) ............................................ 16

*People v. Handsome*,
  18 Misc. 3d 543, 846 N.Y.S.2d 852 (Crim. Ct. 2007) ................... 31

*Peterson v. Kavanagh*,
  21 A.D.3d 617 (3d Dept. 2005) ........................................ 31

*Pointer v. Texas*,
  380 U.S. 400 (1965) .................................................. 42

*Shuttlesworth v. City of Birmingham, Ala.*,
  394 U.S. 147 (1969) .................................................. 44

*Sierra Club v. United States Army Corps of Eng'rs*,
  732 F.2d 253 (2d Cir.1984) ........................................... 34

*Srour v. New York City, New York*,
  2023 WL 7005172 (S.D.N.Y. Oct. 24, 2023) ............................. 9

*Srour v. New York City, New York*,
  2023 WL 7091903 (S.D.N.Y. Oct. 26, 2023) ............................. 10

*United States v. Cruikshank*,
  92 U.S. 542 (1876) ................................................... 44

*United States v. Toner*,
  728 F.2d 115 (2d Cir.1984) ........................................... 31

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981) .................................................. 34

*Virginia v. Moore,*
  553 U.S. 164 (2008) ................................................................. 42

*Wallace v. Jaffree,*
  472 U.S. 38 (1985) .................................................................. 42

**Statutes**

18 U.S.C. 922(d)(1) ................................................................... 21
18 U.S.C. 922(g) ......................................................... 16, 21, 37
New York City Administrative Code 10-303(a)(2) ........................ Passim
New York State Penal Law § 400.00 ...................................... Passim

**Rules**

Fed. R. App. P. 30(a)(1)(A)-(B) ............................................... 16
Fed. R.App. P. 10(a)(1) ............................................................ 16

**Regulations**

38 RCNY 3-03 ................................................................... Passim
38 RCNY 5-10 .................................................................. 5, 6, 9

**Other Authorities**

The Sensitive Places Doctrine,
  13 Charleston L. Rev. 205 ........................................................ 33

New York State Governor's Bill Jacket,
  Senate Bill, 136 ....................................................................... 32

iv

## PRELIMINARY STATEMENT

By this appeal, New York City (the "City") seeks to reverse that part of the district court decision that struck, as facially unconstitutional, New York City Administrative Code 10-303(a)(2)[1], which requires the NYPD police commissioner to conduct a "moral character" assessment of all individuals seeking a license to lawfully possess <u>rifles and shotguns</u>[2] for self-defense.

Neither this Nation (nor this State) have a historical tradition of licensing rifles and shotguns, nor did the City satisfy its burden below of proving that its statute is consistent with plain text, history, and tradition of regulating long guns.[3]

The analysis and legal conclusions of the district court were constitutionally sound and should not be disturbed.

### *The New York City Administrative Code ("NYAC")*

In New York City, a license is required to lawfully possess any type of firearm for self-defense – handguns, rifles, and shotguns. Because New York State Penal Law § 400.00, *et seq.* preempts the field of handgun licensing in the State, the New York City Council has not enacted a separate handgun licensing regime.

---

[1] Appellee was also successful in his facial challenge to NYAC 10-303(a)(9), authorizing the denial of a rifle/shotgun license "for any good cause." The City does not challenge that portion of the district court decision and order. [City Br. at 5, n. 1].

[2] No part of this appeal concerns the possession of handguns.

[3] *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17, 24 (2022).

1

But for rifles and shotguns, the New York City Council[4] codified a licensing scheme under the New York City Administrative Code, Title 10 (Public Safety) Chapter 3 (Firearms).

NYAC 10-303 entitled, "Permits for possession and purchase of rifles and shotguns," is New York City's comprehensive rifle/shotgun regulatory scheme.

Relevant here is Appellee Joseph Srour's ("Srour") successful facial challenge to NYAC 10-303(a)(2), which requires an applicant to prove to the NYPD police commissioner, by way of the License Division, that he possesses "good moral character" before he can lawfully possess rifles and shotguns for self-defense. NYAC 10-303 does not define the term 'good moral character.'

### Title 38 of the Rules of the City of New York ("RCNY")

Unlike the NYC Code, the Rules of the City of New York are not the creation of a legislative body. The RCNY are administrative policies and procedures created by the various governmental departments in New York City and published to provide the public with notice of how the agencies intend to enforce the NYC Code. Such departments include the Fire Department (Title 3), Department of Environmental Protection (Title 15), Department of Sanitation (Title 16) and the Police Department (Title 38).

---

[4] New York City's legislative body.

2

Title 38 entitled "Police Department" contains administrative policies and procedures created by a NYPD police commissioner long ago and is amended from time to time according to the desires of each subsequent police commissioner. Title 38 informs the public of how the NYPD administers various New York City statutes including firearm licensing, permits for processions and parades, permits for unmanned aircraft, and bicycle seizures.

Much like the handgun licensing handbooks published by certain counties outside of New York City, 38 RCNY instructs the public on the NYPD's administrative procedures for licensing rifles and shotguns (Chapter 3) and handguns (Chapter 5), including where such applications are made, eligibility for a license, and the grounds for the denial of a license.

Relevant here is 38 RCNY 3 relating to rifles and shotguns entitled, "Rifle/Shotgun Permits."

### 38 RCNY 3-03 "Grounds for Denial of Permit" (Rifles and Shotguns)

The police commissioner, through the NYPD License Division, enforces the New York City rifle/shotgun licensing scheme codified in NYAC 10-303.

Because the City's rifle/shotgun licensing scheme forbids the issuance of a rifle/shotgun license to anyone who lacks 'good moral character,' NYAC 10-303(a)(2) requires the police commissioner to conduct a 'moral character' assessment of every applicant for a R/S license. In that connection, the police

3

commissioner created 38 RCNY 3-03 as an administrative guideline to provide the public with examples of the types of events that will constitute "Grounds for Denial" of a rifle/shotgun license. 38 RCNY 3-03 lists 14 enumerated factors as examples of events upon which the 'good moral character' determination required by NYAC 10-303(a)(2) might be based.

A finding by the License Division that an applicant lacks good moral character will result in the denial of a rifle/shotgun license, as required by NYAC 10-303(a)(2).

### *The District Court Decision*

In 2018, Srour applied to the NYPD License Division for a rifle/shotgun license and a handgun license (premises); both applications were denied in 2019.

The denial of Srour's R/S license was caused by the NYPD License Division's enforcement of NYAC 10-303(a)(2) and (9) and the administrative procedures outlined in 38 RCNY 3-03 "Grounds for Denial" of a R/S license.

Srour brought the action below seeking a judicial declaration that the City statutes and NYPD policies are unconstitutional and to have them permanently enjoined; he also sought monetary damages from the City.

4

In December 2022, while Srour's summary judgment motion was *sub judice*, the NYPD police commissioner amended the preamble to 38 RCNY 3-03[5] to track the 'moral character' language of New York State's handgun licensing regime, which was amended three months earlier by the State Legislature in response to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022).

No changes were made to the City's rifle/shotgun licensing scheme post-*Bruen.* The 'moral character' and 'good cause to deny' statutes codified by the New York City Council in 10-303(a)(2) and (9) remain unchanged, undefined, and unbridled.

After considering the merits of Srour's summary judgment motion and the City's defenses, the district court properly found, *inter alia*, that NYAC 10-303(a)(2) and (9) violate the Second Amendment. [SPA3-4].

The district court also held that the pre-amendment versions of 38 RCNY 3-03 and 5-10 under which Srour's 2018 license applications were denied were unconstitutional for the same reasons [SPA3-4].

**The Amended Versions of the Rules Are Not Part of This Record**

The City improperly asks this Court to consider the post-Decision, amended versions of 38 RCNY 3-03 and 5-10 that are not part of the record below.

---

[5] The preamble to the "Grounds for Denial" of a handgun license under 38 RCNY 5-10 was amended as well.

5

Srour's causes of action arose when he was precluded from possessing rifles, shotguns, and handguns in 2019 by the denial of his license applications. The police commissioner's December 2022 amendments to 38 RCNY 3 and 5 were obviously not enforced against Srour in 2019. Nor did Srour amend his Complaint to challenge the amended rules. The district court held that it could not enjoin 38 RCNY 3-03 and 5-10 in their amended versions. [SPA21-22].

That said, as explained below the police commissioner's amendments are immaterial. Striking NYAC 10-303(a)(2) from the New York City R/S licensing scheme divests the police commissioner of any authority to conduct a 'moral character' assessment of rifle/shotgun applicants – just like the New York State handgun licensing officers were divested of any authority to impose a 'proper cause' requirement on concealed carry applicants after the *Bruen* decision.

### The District Court Should Be Affirmed

The district court properly struck NYAC 10-303(a)(2) as facially unconstitutional because the City failed to identify an historical analogue for its rifle/shotgun regulations, as required by the *Bruen* test. The district court's text, history, and tradition analysis was consistent with the plain text of the Second Amendment, this Nation's historical traditions, and Supreme Court precedent, and should not be disturbed.

### *The City's Theories Are Meritless*

Article III standing is properly viewed under the facts as they existed when the action was commenced. Contrary to well-settled precedent, the City improperly urges the Court to reevaluate Srour's Article III standing at the *end* of the case. To *keep* Article III standing, the City requires Srour to *reapply and be denied* because the police commissioner amended his administrative guidelines for determining 'moral character.' The City's standing argument should be rejected.

The City also fails to appreciate that the City Council's statutes, and not the police commissioner's administrative rules, constitute the R/S licensing scheme for New York City. By striking the 'moral character' requirement for R/S licenses, the district court essentially nullified 38 RCNY 3-03. Without the statutory authority of 10-303(a)(2) behind him, the police commissioner may no longer enforce a moral character assessment for R/S license applicants.

The City also leans heavily on *Antonyuk*, which is not dispositive of this appeal for several reasons. For one, *Antonyuk* involved a challenge to a *handgun* licensing scheme, not rifles and shotguns for which there is no historical tradition of requiring a license. *Antonyuk* was also an interlocutory appeal, not a determination on the merits, and is therefore not binding on this panel.

The City's misguided arguments continue with its plea against the permanent injunction of 10-303(a)(2), improperly advancing a constitutionally

prohibited balancing test to collaterally justify the statute here - after failing to meet its burden under *Bruen* below.

Under *Bruen*'s text, history, and tradition test, however, there is no 'balancing' of interests. Where the government fails to justify its regulations, as the City failed below, the statute is deemed unconstitutional and properly stricken. *Bruen*, 597 U.S. at 17, 24.

## ABRIDGED FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-Appellee Joseph Srour sought redress in the district court for the violation of his Second Amendment rights caused by the License Division's 2019 denial of his application for a rifle/shotgun license.[6]

The denial of Srour's R/S license was caused by the NYPD License Division enforcement of New York City Administrative Code 10-303(a)(2) (good moral character) and (a)(9) (good cause to deny), and the police commissioner's policies under the 38 RCNY 3-03 "Grounds for Denial" of a R/S license.

In December 2022, while Plaintiff's summary judgment motion was *sub judice*, the police commissioner amended the preamble of 38 RCNY 3-03 to (roughly) track the 'moral character' language of New York State's handgun licensing scheme.[7] [A317]; Penal Law 400.00(1)(b).

---

[6] The City also denied Srour's application for a license to possess handguns in his home.

[7] After his successful facial challenge to NYAC 10-303(a)(2) and (a)(9), Srour applied for a license to possess handguns (residence), carry handguns concealed, and to possess rifles and

In a tempered and well-reasoned 48-page opinion, the district court granted, in part, Plaintiff's motion for summary judgment. Relevant here, the district court held that the 'moral character' assessment and 'good cause to deny' factors for a R/S license under NYAC 10-303(a)(2) and (9) were facially unconstitutional and the former versions of 38 RCNY 3-03 and 5-10 violated the Second Amendment

> "…the fatal problem with subsections (a)(2) and (a)(9) of New York
> City Administrative Code Section 10-303 and the former versions of
> Sections 3-03 and 5-10 of Title 38 of the RCNY continues to lie in
> the broad discretion afforded to City officials in determining whether
> someone may exercise their Second Amendment right. Defendants
> have not identified any historical analogue for investing officials
> with the broad discretion to restrict someone's Second Amendment
> right based on determining the person to 'lack[] good moral
> character' or for a vague and undefined notion of 'good cause.'"[8]
> [SPA31].

The district court issued a permanent injunction of NYAC 10-303(a)(2) and (9). *Srour v. New York City, New York*, No. 22 CIV. 3 (JPC), 2023 WL 7005172 (S.D.N.Y. Oct. 24, 2023)

shotguns, and filed a complaint to enjoin the enforcement of 38 RCNY 3-03 and 5-10, as amended. But the amended versions of 38 RCNY 3-03 and 5-10 are not part of this appeal or the case below. The district court ruled only on the regulations as they existed at the time they were applied to Srour's applications in 2019. NYAC 10-303(a)(2) and (9), which were not amended by the City Council, were properly subject to equitable relief below.

[8] The district court did not reach a determination of the constitutionality of the enumerated subsections (a, e, h, and n) of 38 RCNY 3-03 and 5-10. The court reasoned that "the excessive discretion vested to the licensing officials pursuant to the former Sections 3-03 and 5-10 does not pass muster under the Second Amendment is based on the discretionary authority afforded to the licensing officials to allow them to deny applicants their Second Amendment rights based on a determination of 'good moral character' or 'other good cause' *in all circumstances*." [SPA40, n. 22] (emphasis added).

9

The City moved for a stay of the decision, which was properly denied by the district court on October 26, 2023. *Srour v. New York City, New York*, No. 22 CIV. 3 (JPC), 2023 WL 7091903 (S.D.N.Y. Oct. 26, 2023).

The City then moved for a stay of the district court's permanent injunction of NYAC 10-303(a)(2) pending appeal, which was granted by the motions panel in reliance on *Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023).

## SUMMARY OF ARGUMENTS

The only statute under consideration in this appeal is New York City Administrative Code 10-303(a)(2), which requires individuals to prove they possess "good moral character" before they may lawfully possess rifles and shotguns for self-defense.[9]

The City's Article III standing claim is legally unsound. Article III standing is assessed by looking at the facts as they existed when the action was commenced. Srour easily satisfies the standard for Article III standing. The City also improperly refers to facts outside of the record, including Srour's pending license applications, which post-date the decision appealed from, are *sub judice* in the court below, and are not ripe for this Court's consideration [Point I].

The New York City Code consists of statutes enacted by the City's legislative body. Like New York State's handgun licensing regime under Penal

---

[9] NYAC 10-303 has no effect on the possession or carriage of handguns.

10

Law 400.00, NYAC 10-303 is a self-enforcing statute and not dependent on the local administrative policies created by the police commissioner. The City's statutory construction theories are just wrong [Point II].

The district court's application of the *Bruen* test, and thorough historical analysis, are consistent with the plain text of the Second Amendment and squarely on point with Supreme Court constitutional precedent [Point III, Point VI].

There is no historical tradition of requiring a license to lawfully possess rifles and shotguns, or subjecting the citizenry to a 'moral character' assessment *before* they may lawfully possess rifles and shotguns [Point IV].

The City erroneously leans on *Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023), an interlocutory appeal reversing the Northern District's issuance of a preliminary junction of the State's handgun licensing scheme. Relevant here, *Antonyuk* involved the "moral character" requirement for handgun possession under Penal Law 400.00(1)(b) [Point V].

The City statute at issue in this appeal involves rifles and shotguns; this appeal does not concern the possession of handguns.

The standard before the *Antonyuk* panel was whether the plaintiffs had proven a "likelihood of success on the merits," but this appeal comes to the Court after a merit-based determination at the summary judgment stage, and the district

court's finding that the City failed to carry its burden of satisfying the text, history, and tradition test under *Bruen*.

*Antonyuk* is also not binding on this panel (nor is the decision of the motions panel here). A decision on an appeal of a preliminary injunction motion is not binding on its own trial court; it certainly cannot be binding on the parties here.[10] *Antonyuk* did not involve a determination on the merits, nor did the panel dismiss the complaint; it remanded for further proceedings.

Nor should the Court rely on the historical analysis and application of the *Bruen* test in *Antonyuk*, which was constitutionally unsound. The decision ignores Supreme Court precedent governing constitutional interpretation, as well as pivotal instructions laid out by *Bruen* for the inferior courts to follow in Second Amendment challenges, particularly on the issue of government discretion.

*Antonyuk* was also premised on a handgun licensing scheme; neither the panel nor the parties in *Antonyuk* conducted an analysis of the historical traditions of long gun regulations, which do not exist.

Even if *Antonyuk* were binding on this panel, the outcome remains the same. *Antonyuk*'s interpretation of the discretion authorized under the State's "moral character" factor for handguns is substantially narrower than the unbridled

---

[10] Nor should it be; the cases involve different government bodies, plaintiffs, and statutory language.

12

discretion imbued in the police commissioner under NYAC 10-303(a)(2) to prevent the right to possess rifles and shotguns for self-defense.

The balancing test pressed by the City to avoid the permanent injunction of 10-303(a)(2) is wholly improper and contrary to *Heller, McDonald,* and *Bruen*, which rejected means-end interest balancing in Second Amendment challenges [Point VII].

The district court decision and order should be affirmed, and the stay of the part of the district court's order enjoining New York City Administrative Code § 10-303(a)(2) should be vacated.

## ARGUMENT

## I. SROUR HAS ARTICLE III STANDING

### A. Article III Standing Existed When the Complaint Was Filed

The City's standing argument sidesteps well-settled caselaw.

Courts generally determine Article III standing based on the facts that exist when a complaint is filed. *Lower E. Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 579–80 (S.D.N.Y. 2018) citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed.") (internal quotation marks, citation, and emphasis omitted); *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had

13

the requisite stake in the outcome when the suit was filed."); *Chen–Oster v. Goldman, Sachs & Co.*, 251 F.Supp.3d 579, 589 (S.D.N.Y. 2017) ("Standing is generally determined when the complaint is filed.").

The "irreducible constitutional minimum" of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lower E. Side People's Fed. Credit Union v. Trump*, 289 F. Supp. 3d 568, 575 (S.D.N.Y. 2018) quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The facts as they existed when the Complaint was filed in 2020 satisfy the Article III standing requirements. Srour suffered an injury-in-fact by the 2019 denial of his right to possess rifles and shotguns for self-defense; the injury is directly traceable to the NYPD License Division's enforcement of the moral character requirement of NYAC 10-303(a)(2); and the harm was likely to be redressed by a favorable judicial decision -- the permanent injunction of NYAC 10-303(a)(2) removes a 'good moral character' assessment from the New York City rifle/shotgun licensing scheme.

14

## B. Srour Did Not 'Lose Standing' by Winning His Facial Challenge

According to the City, Srour somehow lost his Article III standing two years into the litigation because the police commissioner changed how he would administer the City R/S licensing regime. To *regain* standing, the City posits, Srour must reapply for the licenses he was denied, be subjected to the police commissioner's amended rules, and be denied *again* for NYAC 10-303(a)(2) to be enjoined. The City's theory turns Article III standing on its head.

The City reaches this conclusion by attempting to equate the police commissioner's rules with statutes enacted by New York City's legislative body. But the police commissioner's internal policies for *administering* the licensing scheme does not have an upstream effect on the actual New York City R/S licensing scheme. Conversely, the validity and effect of NYAC 10-303 is not dependent on what, if any, the rules the police commissioner decides to make up. NYAC 10-303 is a self-executing statute.

The City also ignores the fact that striking NYAC 10-303(a)(2) renders 38 RCNY 3-03 obsolete. Section 3-03 is simply an outline of how the police commissioner enforces NYAC 10-303(a)(2). The permanent injunction of 10-303(a)(2) ordered by the district court nullifies the police commissioner's authority to conduct a 'moral character' assessment of rifle/shotgun applicants. Meaning

15

that, the License Division must now only enforce the objective statutory firearm disqualifiers identified in 18 U.S.C. 922(g), Penal Law 265.00(17), and 265.01(4).

### C. Srour's Post-Decision License Applications Are Outside of This Record and *Sub Judice* In A Separate District Court Case

The record on appeal is limited to "the original papers and exhibits filed in the district court." Fed. R.App. P. 10(a)(1). "Ordinarily, material not included in the record on appeal will not be considered" [*Loria v. Gorman*, 306 F.3d 1271, 1280 n. 2 (2d Cir.2002) (internal citation omitted)] and no "extraordinary circumstances" exist here that would warrant consideration of anything outside the record. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 124 (2d Cir.2010) (citation omitted).

The City's appendix contains "the relevant docket entries in the proceeding below" and "the relevant portions of the pleadings, charge, findings, or opinion." Fed. R. App. P. 30(a)(1)(A)-(B). Yet, it proceeds to import immaterial and extraneous information into its opening brief.

Srour's post-Decision license applications and post-Decision lawsuit are not part of the record and played no part in the district court decision appealed from. The only statutes found to be facially unconstitutional and stricken by the district court are NYAC 10-303(a)(2) and (9).

16

The police commissioner's December 2022 amendments are neither relevant nor material to Srour's Article III standing to challenge 10-303(a)(2) at the time the Complaint was filed in 2020.

## II.   NYAC 10-303 IS A STATUTORY SCHEME CREATED BY AN ELECTED LEGISLATIVE BODY FOR LICENSING RIFLES AND SHOTGUNS; RCNY 3-03 ARE ADMINISTRATIVE RULES AMENDABLE AT THE WILL OF A POLICE COMMISSIONER

The City leans heavily on the idea that, without consideration of statutory construction, the district court could not properly reach a determination of the constitutionality of NYAC 10-303(a)(2) [City Br. at 27]. But there is no statutory ambiguity to be cleared up.

### A.  New York Administrative Code

The New York City Administrative Code consists of statutes enacted by the New York City Council.  Chapter 3 of Title 10, entitled "Firearms," contains New York City's legislation regarding the "Control and regulation of the disposition, purchase and possession of firearms, rifles, shotguns and assault weapons." Title 10 contains a definitions section, a penalty section, the City's licensing scheme for rifles and shotguns, handgun dealers, rifle/shotgun dealers, and gunsmiths. 10-302, 10-303.[11]

---

[11] No handgun licensing scheme was codified by the City Council because the New York State licensing scheme preempts the field of handgun licensing, except where not specifically set forth in Penal Law 400.

In the same manner that Penal Law 400.00 is the State's licensing and regulatory scheme for handguns, NYAC is the City's licensing and regulatory scheme for rifles and shotguns; both were created by an elected legislative body.

**B. The Rules of the City of New York**

On the other hand, the Rules of the City of New York are administrative rules and procedures promulgated by the unelected heads of various municipal agencies to provide notice to the public of how the department intends to carry out legislation enacted by the City Council.

**C.  38 RCNY 3 Is An Administrative Policy of the Police Commissioner, Not an 'Implementing Regulation'**

Title 38 of the Rules of the City of New York are created by the police commissioner for, *inter alia*, administering the City's rifle/shotgun licensing scheme [38 RCNY 3] and the State's handgun licensing scheme [38 RCNY 5].

Chapters 3 and 5 are a more formal and detailed version of the "pistol licensing handbooks" created by various licensing officers (Nassau and Suffolk) and/or county police agencies (upstate) outside of New York City, which provide the public with notice of how the State's handgun licensing scheme is administered in that particular county.

The City's characterization of 38 RCNY 3 and 5 as "implementing regulations" is misleading and incorrect.

18

To be sure, 38 RCNY 5 is certainly not an "implementing regulation" for Penal Law 400.00. Penal Law 400.00 is self-executing and administered by the various licensing officers around the state, including the NYPD police commissioner who is an enumerated New York State handgun licensing officer.[12]

When a provision of the State licensing statute is stricken, like the "proper cause" requirement was in *Bruen*, the licensing officers are divested of the ability to enforce that requirement for handgun license applicants.

Likewise, 38 RCNY 3-03 is not an "implementing regulation." In the same manner that Penal Law 400.00 is the State's handgun licensing scheme, NYAC 10-303 is New York City's R/S licensing scheme.

Like Penal Law 400.00, NYAC 10-303 also sets forth the eligibility requirements for a R/S license, where applications are made, the investigation requirement, fees, time period for issuance, and revocation/suspension of a permit.

And as with Penal Law 400.00, NYAC 10-303 is a self-executing regulatory scheme administered by the police commissioner, just as he administers the State handgun licensing statutes.

### D. When the District Court Struck NYAC 10-303(A)(2) As Facially Unconstitutional, 38 RCNY 3-03 Became a Nullity

NYAC 10-303 and 38 RCNY 3-03 only 'work together,' as the City describes, to the extent that there is a licensing statute to be enforced by the police

---

[12] Penal Law 265.00(10) (defining/enumerating the state's statutory licensing officers).

commissioner. But when a provision of the City Council's licensing scheme is stricken, the police commissioner is divested of any authority to enforce the provision that has been permanently enjoined.

The police commissioner only has authority to create a procedure for enforcing 10-303(a)(2) so long as the statute remains in effect. The police commissioner cannot enforce a 'moral character' requirement in the absence of NYAC 10-303(a)(2) because a police commissioner has no licensing authority over rifles and shotguns independent of the authority granted by the City Council.

By analogy, when the Supreme Court struck down the State's 'proper cause' requirement to obtain a concealed carry license in *Bruen*, the licensing officers throughout the state (including the NYPD police commissioner) were divested of their authority to continue to impose a 'proper cause' requirement on handgun license applicants. Licensing officers act in an executive capacity to enforce existing statutes; they have no authority to promulgate legislation.

The police commissioner's administrative procedures for enforcing NYAC 10-303(a)(2), as set forth in 38 RCNY 3-03, *only* exist to enforce the City statute. Like the elimination of the 'proper cause' requirement, the district court injunction of NYAC 10-303(a)(2) divests the NYPD police commissioner of all authority to enforce a moral character requirement for R/S licenses.

But lest the City complain that the License Division now has no means of preventing 'dangerous' individuals from obtaining rifles and shotguns, New York State requires a federal background check be performed for every purchase of a handgun, rifle, and shotgun.[13] Any potential purchaser with a statutory disqualifier will be prohibited from taking possession of any firearms.

Should rifle/shotgun licensing continue in the City, despite the absence of an historical analogue, the License Division is still prohibited under state and federal law from issuing a R/S license to any individual prohibited from possessing firearms under 18 U.S.C. 922(g), Penal Law 265.00(17), or 265.01(4) – objective firearm disqualifiers enacted by a legislative body.[14]

## III.  THE DISTRICT COURT PROPERLY APPLIED THE *BRUEN* TEST AND REACHED A CONSTITUTIONALLY SOUND CONCLUSION

In keeping with *Heller*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may

---

[13] https://newyork.public.law/laws/n.y._general_business_law_section_898
[14] The City misleads the Court by representing that an injunction of NYAC 10-303(a)(2) will prevent the City from denying a rifle/shotgun permit to someone who is 'under indictment' [City Br. at 42]. See, 18 U.S.C. 922(d)(1) prohibiting transfer of firearms to any individual presently under indictment.

a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17, 24.

The City failed below for several reasons: the City's proffered analogues (i) pertained to the concealed carriage of handguns (not at issue here), (ii) forbade criminal activity, but had no effect on peaceful possession for self-defense, (iii) identified no Founding Era licensing tradition; (iv) improperly placed the burden on Srour prove that a National tradition *did not exist*; and (v) otherwise conflicted with the plain text of the Second Amendment.

## A. Srour's Conduct Was Correctly Deemed 'Presumptively Protected'

The district court first considered whether Srour's conduct was covered by the text of the Second Amendment. The court properly found that the conduct at issue -- the possession of rifles and shotguns for lawful purposes -- plainly falls within the text of the Second Amendment. [SPA3]. *Bruen*, at 597 U.S. at 17, 24; *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

## B. The District Court Properly Found The City's Regulations Are As Impermissibly Discretionary As The Now-Stricken 'Proper Cause'

The court correctly found that the good moral character assessment authorized by NYAC 10-303(a)(2) improperly "empower[s] a City licensing official to decide not to issue a permit or license for a firearm based on that official's discretionary assessment of the applicant's "good moral character" [10-303(a)(2)] and the determination of a vaguely defined presence of "good cause"

22

[10-303(a)(9)] [SPA29]. The court correctly reasoned that, much like the "proper cause" inquiry invalidated in *Bruen*, permitting denial of a firearms license based on a government official's "good moral character" assessment or "good cause to deny" has the effect of "prevent[ing] law abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" [SPA29] quoting *Bruen*, 597 U.S. at 71.

## C. The Court Properly Found 10-303(a)(2) Vague and Overbroad

Consistent with *Bruen,* the district court held the City to its burden of demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 71.

Subsections (a)(2) and (a)(9) allow a City official to deny a shotgun or rifle permit after finding that an applicant "is not of good moral character" or that "good cause exists for the denial of the permit" but "defines neither of these terms in further detail [SPA30]. "Without doubt, the very notions of "good moral character" and "good cause" are inherently exceedingly broad and discretionary. Someone may be deemed to have good moral character by one person, yet a very morally flawed character by another. Such unfettered discretion is hard, if not impossible, to reconcile with *Bruen*." [SPA30].

23

### D.  NYAC 10-303(a)(2) Addresses The Same Societal Problem As *Heller* and *Bruen*: "Handgun Violence in Urban Areas"

The City concedes that the challenged provisions and their suggested historical analogues are geared towards "ensuring public safety" [SBA31], which constitutes both an impermissible balancing of government interests against the individual rights of the People[15] *and* involves the same societal problem addressed by the *Heller* and *Bruen* courts.

The governments in *Heller* and *Bruen* addressed the same "perceived societal problem - firearm violence in densely populated communities." Just as the Founders could have adopted laws similar to D.C. and New York to confront the same problem – but did not [*Bruen*, 597 U.S. at 28-29], the absence of any historical analogue demonstrates that New York City's moral character requirement for possessing rifles and shotguns violates the Second Amendment.

After considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the government's regulations, *Heller* and *Bruen* concluded that the statutes were unconstitutional. *Bruen*, 597 U.S. at 27 (finding no such tradition in the historical

---

[15] *McDonald*, 561 U.S. at 783 (rejecting interest balancing in Second Amendment challenges because the "right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.") (collecting cases).

materials that respondents and their *amici* have brought to bear on that question); *Heller*, 554 U.S. at 631 (describing the claim that "there were somewhat similar restrictions in the founding period" a "false proposition").

The district court also correctly held that the historical information presented by the City failed to reveal "distinctly similar historical regulations." [SPA31]. No historical analogue was introduced by the City that vests officials with the broad discretion to restrict someone's Second Amendment right based on an opinion that he lacks 'good moral character.' [SPA30-31].

The court properly found that laws "disarming classes of people deemed to be threats, including those unwilling to take an oath of allegiance (to the crown and later the states), slaves, and native Americans" "hardly entailed the sort of discretionary disarming that is at issue in this case." [SPA33]. Loyalty oath requirements, on the other hand, "provided an objective criterion for an administering official to assess: did the person make the oath or not?" Disarming slaves and Native Americans meant they possessed Arms in the first instance (and did not have to prove something to *become* armed).

The court correctly found that the City "identified no historical analogue for denying a person's exercise of their Second Amendment right upon on a municipality official's subjective assessment of that person's character, or based on a vague determination of the existence of good cause—particularly when that

determination is made after weighing in an undefined manner both objective and subjective factors." [SPA34].

The district court also appropriately rejected the City's reference to surety statutes as an analogue because "most significantly, the lack of "good moral character" or "other good cause" standards under…subsections (a)(2) and (a)(9) of New York City Administrative Code Section 10-303 are vastly broader than the circumstances that triggered a surety obligation under these statutes." Moreover, the surety statutes cited "generally provide for a person to be 'bound over' and do not mention firearms or arms of any kind" and therefore do not provide "comparable burdens for regulating the possession of firearms" nor are they "relevant to the issue of firearms possession." [SPA34-36]. Harkening to *Bruen*'s discussion of surety laws, the court noted that such laws "required certain individuals to post bond before *carrying weapons in public* [SPA37] (citation omitted) (emphasis supplied), not complete disarmament of the individual.

The court also observed, *Bruen*'s conclusion that "the surety statues presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing" was "quite different from the situation here, where a New York City official can deny the right to possess a firearm in the first instance based on a vague and unconstrained finding of a lack of 'good moral character' or the presence of 'good cause'" [SPA37] quoting *Bruen*, 597 U.S. at 57.

26

"*Bruen* further expressed skepticism that such surety laws were regularly enforced to an extent that they burdened the right to bear arms" and the City provided no additional information in that regard [SPA37-38].

The City's "affray" analogues fared no better. [SPA38-40]. First, these criminal laws affected *public carriage* of weapons. This was not a public carry case. Srour challenged regulations that barred him from exercising the right to possess rifles and shotguns.

Second, as *Bruen*'s lengthy historical analysis bears out, statutes forbidding criminal conduct, like brandishing, 'affray' and other threatening behavior, are not analogues for the peaceful carriage of weapons for self-defense. *Bruen*, 597 U.S. at 44-52.

Instead of helping its cause, the City's criminal analogues proved that "but for the specified activity—e.g., fighting, rioting, or disturbing or breaking the peace—the right to possess those arms was presumed." [SPA39].

### E.  The Court Correctly Found That the City Improperly Placed The Burden on Srour

The City improperly shifts to Srour its burden of justifying its firearm regulations under the *Bruen* test [City Br. at 4 "Issue Presented For Review"], a tactic denounced by the district court. "In their briefing, Defendants at times seem not to appreciate that it is their burden to come forward with evidence that the challenged regulations are consistent with our country's historical tradition of

firearm regulation... *Bruen* was clear that this is in fact *Defendants'* burden."
[SPA11-12 n. 6] (emphasis added).

Srour has no burden to "show the law is unconstitutional." Proof of the
unconstitutionality of the City's law arises from the City's *failure* to establish that
its firearm regulation is consistent with the plain text of the Second Amendment.

Because Srour's conduct is covered by the plain text of the Second
Amendment, such conduct is presumptively protected by the Constitution. *Bruen*,
597 U.S. at 17, 24. The burden immediately shifted to the City to "demonstrate that
the regulation is consistent with this Nation's historical tradition of firearm
regulation" [*Id.*], which the City failed to do.[16]

## IV. THERE IS NO HISTORICAL TRADITION OF LICENSING RIFLES AND SHOTGUNS -- IN THIS NATION OR NEW YORK STATE

### A. No Tradition of Licensing Rifles and Shotguns

Requiring a license to exercise a 'Natural Right' is an oxymoron, and
repugnant to the plain text of the Second Amendment.

In fact, the right to possess rifles and shotguns was unencumbered
throughout this country from before the Revolutionary War through the 20th

---

[16] The City did not identify an historical analogue for licensing rifles and shotguns, never mind a
'moral character' assessment by a government official.

Century. Even New York State does not require its residents to apply for and obtain a permissive license to possess shotguns and rifles.[17]

The Framers, who had just secured America's independence from an oppressive governing force, intended to cement the Right to be Armed into this Nation's core. As *Heller* recognized, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Heller*, 554 U.S. at 598. The Framers would not have accepted – to any degree – government control over the People's access to Arms.

> The ideology underlying all forms of American resistance to British usurpations and infringements was explicitly premised on the right of self-defense of all inalienable rights; from the self-defense foundation was constructed a political theory in which the people were the masters and government the servant, so that the people have the right to remove a disobedient servant.
>
> First, by disarming the Americans, the British were attempting to make the practical exercise of the right of personal self-defense much more difficult. Second, and more fundamentally, the Americans made no distinction between self-defense against a lone criminal or against a criminal government.
>
> To the Americans (and to their British Whig ancestors), the right of self-defense necessarily implied the right of armed self-defense against tyranny.[18]

The Framers knew well that those who forget history are doomed to repeat it.[19]

---

[17] In 2022, New York State lassoed commonly possessed semiautomatic rifles into the State's may-issue handgun licensing scheme. Penal Law 400.00, *et seq.*

[18] Kopel, David, *How the British Gun Control Program Precipitated the American Revolution*, Charleston Law Review, Vol. 2, Winter 2012, No. 2, at 301.

[19] While a great deal of constitutional ground has been lost since the Ratification, the words codified by the Founding Fathers and currently enforced by 28 "constitutional carry states"

29

## B. Licensing Second Amendment Rights 'Appeared' Over 100 Years After the Ratification – And Only Applied To Handguns

The plain text of the Second Amendment declares that the right "shall not be infringed" – not, "shall not be infringed once permission has been granted." As Srour argued below, no one was required to seek or obtain permission from the government before possessing or carrying firearms in the Founding Era. [ECF Doc. 26 at p. 13-14].

New York implemented a handgun licensing scheme in 1905, which was expanded with the Sullivan Law in 1911 – 120 years after the ratification of the Second Amendment.[20]

The Sullivan Law cloaked the State's licensing officers with broad discretion to conduct "moral character" assessments, based on the (false) premise that the Second Amendment applied to the militia – that there was no individual right to keep and bear arms. *United States v. Toner*, 728 F.2d 115, 128 (2d Cir.1984) ("the right to possess a gun is clearly not a fundamental right"); *Citizens for a Safer Cmty. v. City of Rochester*, 627 N.Y.S.2d 193, 197 (Sup. Ct. 1994) (The Second Amendment limits only the power of Congress to infringe upon the right to keep and bear arms necessary for the militia); *Peterson v. Kavanagh*, 21 A.D.3d 617,

---

remain in effect. https://crimeresearch.org/2024/03/louisiana-becomes-the-28th-constitutional-carry-state-45-2-of-americans-now-live-in-constitutional-carry-states-with-66-9-of-the-area/

[20] *Bruen*, 597 U.S. at 11 (In 1911, New York's "Sullivan Law" expanded the State's criminal prohibition to the possession of all handguns—concealed or otherwise—without a government-issued license).

618 (3d Dept. 2005) ("absent evidence that possession of the pistol bears some reasonable relationship to the preservation or efficiency of a well-regulated militia, no individual right to possess it is conferred") citing *Bach v. Pataki*, 289 F.Supp.2d 217, 224–226 (2003); *People v. Handsome*, 18 Misc. 3d 543, 554, 846 N.Y.S.2d 852, 860 (Crim. Ct. 2007) (the Second Amendment does not confer an individual right to bear arms).

Because licensing did not appear until the late 1800s[21] (carrying handguns), there could not have been a 'national tradition' of licensing firearms generally (and certainly not licensing long guns) during a time relevant to the "public understanding" of the Second Amendment when it was ratified.[22]

### C. New York's Legislature Recognized That Licensing Rifles and Shotguns is Contrary to the Unfettered Right to Possess Rifles and Shotguns in This Nation

In 1963, the New York Legislature confessed that licensing rifles and shotguns was not an American pastime. At that time, the Legislature undertook an overhaul of the original Sullivan Law because the former sections were "scattered through almost a hundred numbered provisions."[23] SB136 amended the Penal Law "in relation to the carrying, sale, possession and use of firearms and other

---

[21] See, *Antonyuk*, at 317 (identifying late-1800 municipal ordinances in various states requiring a handgun license).

[22] *Bruen*, 597 U.S. at 37 (the scope of protection is "pegged to the public understanding of the right" when the Bill of Rights was adopted in 1791).

[23] See, New York State Governor's Bill Jacket, Senate Bill 136 p. 39, 42 ("Bill Jacket") annexed hereto (relevant portion).

dangerous weapons, and the issuance of licenses therefore…" The research conducted by the Legislature revealed that the licensing and registering of rifles and shotguns in the fifty-one American jurisdictions was "virtually non-existent."[24]

> "[T]he estimate of twenty to forty million rifles and shotguns in the hands of the civilian population of the United States is entirely credible. In recent years, hundreds of thousands of military rifles have been imported from Europe, with the pro forma approval of the United States Department of State. Thousands of other such rifles have been released by the Department of Defense…States surrounding New York have no restrictions, except those already pointed out, on rifles and shotguns.

> Under these circumstances, any proposal to register rifles and shotguns in the single State of New York would not only impose a governmental burden of Augean proportions but also would in all probability not prevent their possession by persons dangerously likely to use them in the commission of crimes."

There is no historical tradition of requiring a license to possess rifles and shotguns, as New York State recognized in 1963.[25] New York City itself had no licensing requirement for rifles and shotguns until 1967.[26] [City Br. at 6].

---

[24] Observing that "Under a unique provision, one state (Florida) requires a license for a certain type of rifle described as a Winchester or repeating rifle. In another state (Hawaii), in the unlikely case of a rifle or shotgun with barrel less than eighteen inches in length, a license is required. In New York, any sawed-off shotgun is flatly outlawed." [Bill Jacket].

[25] Below, Plaintiff challenged the City's licensing of long guns in the first instance [ECF No. 26 p. 8-9, 14 ("At the outset, there is no Founding Era historical analogue for the requirement that an individual seek and obtain the permission of the government before being able to exercise the rights protected by the Second Amendment: possessing and carrying weapons for self-defense. It

## V. *ANTONYUK* IS NOT DISPOSITIVE OF THIS APPEAL

The panel determination in *Antonyuk v. Chiumento*, is not dispositive of this appeal. First, there was no determination on the merits of the claims and defenses in the underlying proceeding. *Antonyuk* reviewed the State's interlocutory appeal of a preliminary injunction of certain state statutes. Second, the panel analyzed firearm regulations imposed by New York State on the possession and carriage of handguns, not long guns. Third, the New York City moral character statute for rifles and shotguns is far broader than the State's moral character requirement for handguns, as interpreted by the *Antonyuk* panel.

### A. *Antonyuk* Involved the Interlocutory Appeal of a Preliminary Injunction of State Handgun Regulations

Findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial or summary judgment. See, e.g., *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644–45 (2d Cir. 1998); *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative

---

is against this background that the City's regulations are challenged.")] The City failed to identify any historical precedent to justify licensing a preexisting individual right.

[26] When Antonin Scalia was growing up in New York City in the 1950s, he carried a rifle on the subway on his way to school, for use as a member of his school's rifle team. Associated Press, Scalia Says Don't Link Guns Only to Crime, Seattle Times, Feb. 27, 2006, Dave Kopel, "the Sensitive Places Doctrine," 13 Charleston L. Rev. 205, Winter 2018 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3361371 citing, http://seattletimes.nwsource.com/cgi-bin/
PrintStory.pl?slug=scalia27&date=20060227 (reporting Scalia's speech to an annual meeting of National Wild Turkey Federation).

positions of the parties until a trial on the merits can be held. Given this limited purpose .... findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits."); *Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 274 (2d Cir.1992) ("[a] preliminary determination of likelihood of success on the merits ... is ordinarily tentative, pending a trial or motion for summary judgment").

*Antonyuk* involved the State's interlocutory appeal of a decision on a preliminary injunction motion; not a determination on the merits of the arguments made by the parties before the district court in that case.

As this Circuit stated in *Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir.1984): "A preliminary injunction is issued to maintain the *status quo* until there can be a hearing on the merits." *Goodheart Clothing*, at 274 (It would therefore be anomalous in most cases, and here, to regard the initial ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction stage expressly envisions) citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985); *Arthur Guinness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, 1099 (2d Cir.1984); *Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976). See also, *Cayuga Indian Nation of New York v. Seneca Cnty., New York*, 978 F.3d 829, 834 (2d Cir. 2020) (It would be anomalous to regard the initial preliminary injunction

34

ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions).

If *Antonyuk* is not binding on its *own* district court's determination of the merits of *those* plaintiffs' claims, it cannot be binding in this appeal, which involves a different plaintiff, separate governmental body, and a different firearm regulation that grants substantially broader discretion.[27]

## B. *Antonyuk* Involved a Challenge to Handgun Regulations

Relevant here, *Antonyuk* involved a challenge to a State handgun licensing statute. No historical analysis was conducted by the Court or the parties to determine whether licensing rifles and shotguns is consistent with the plain text of the Second Amendment, which it is decidedly not.

To the extent that moral character assessments were conducted in the Founding Era, they may be analogous to the post-Revolutionary War 'loyalty oaths' required to be taken to ensure that the armed citizens were loyal to America, and not British sympathizers. That is the extent to which 'dangerousness' was assessed.[28]

---

[27] This panel is also not bound by the methodology and analysis giving rise to the *Antonyuk* opinion, which omitted substantial relevant and material portions of *Bruen*'s historical and legal analysis to reach a determination that conflicts with the plain text, history and tradition of firearm regulation, as well as Supreme Court precedent in constitutional interpretation.

[28] *Bruen*, 597 U.S. at 127 ("The constitutional rights of all *loyal* and well-disposed inhabitants to bear arms will not be infringed; nevertheless, this shall not be construed to sanction the unlawful practice of carrying concealed weapons") citing Cong. Globe, 39th Cong., 1st Sess., 908 (1866)

### C. *Antonyuk's* Historical Analysis Is Constitutionally Unsound

Even in its analysis of handgun regulations, *Antonyuk's* historical analysis and application of the *Bruen* test to the State's moral character requirement is unsound. No Supreme Court case has looked to post-ratification history as the pivotal time period for interpreting the Bill of Rights.

*Antonyuk* disregards Second Amendment jurisprudence and the explicit rejection of subjectivity and discretion in *Heller, McDonald,* and *Bruen*.

> "For as long as licensing has been used to regulate privately-owned firearms, issuance has been based on discretionary judgments by local officials. Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment." *Antonyuk*, at 312.

The flaw in the panel decision is that it used 20th century subjective, discretionary regulations to justify *more* subjective, discretionary regulations. Rather than beginning with the plain text of the Second Amendment, and whether the State identified Founding Era analogues (or later-era regulations that did not contradict the plain text of the Second Amendment), the court presumed that, because licensing has always been discretionary, it can continue to be.

---

(emphasis added). Noting the restriction to 'loyal' inhabitants and the *de facto* lawfulness of the open carriage of weapons, which necessarily includes long guns.

36

### D. The City Statute Is Distinguishable: NYAC 10-303(a)(2) Authorizes Unrestrained Discretion

The discretion authorized under the State's handgun licensing scheme is significantly narrower than the limitless discretion imbued in the licensing officer under NYAC 10-303(a)(2).

> Penal Law 400.00(1)(b) defines "good moral" character as "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

*Antonyuk* interprets the State's statutory "moral character" assessment as "a proxy for dangerousness: whether the applicant, if licensed to carry a firearm, is likely to pose a danger to himself, others, or public safety." [29] *Antonyuk*, at 312.[30]

But the 'good moral character' assessment of 10-303(a)(2) is undefined and lacks boundaries; the determination is left to the whim of a government official.

---

[29] The historical analysis leading to *Antonyuk*'s conclusion of the State's "moral character" requirement for handgun possession is constitutionally unsound. A "dangerousness" disqualification in the Founding Era was a bright line, objective disqualifier. Individuals who would not pledge their loyalty to the new America were divested of their firearms, a regulation analogous to 18 U.S.C. 922(g)(7) (an individual "who, having been a citizen of the United States, has renounced his citizenship").

[30] State legislatures and Congress established bright-line disqualifiers to firearm possession based on enumerated events and conditions deemed "dangerous." 18 U.S.C. 922(g), Penal Law 265.00(17), 265.01(4). 'Individualized' assessments are unconstitutional; the Constitution codifies and protects the Natural rights of "the People."

'Dangerousness' is not the measure.[31], [32] The district court recognized the distinction:

> To be sure, what is constitutionally problematic in this case is not necessarily assessing a license or permit applicant for dangerousness, but rather the excessive discretion vested in licensing officials in making that determination based on "good moral character" or "good cause." [SPA39, n. 21].

## VI.  THE DISTRICT COURT'S HISTORICAL ANALYSIS WAS CONSTITUTIONALLY SOUND

The district court opinion is consistent with the plain text, history and tradition of arms regulation, Supreme Court precedent regarding interpreting Bill of Rights provisions, Supreme Court jurisprudence in Second Amendment challenges, and it should not be disturbed.

---

[31] During oral argument before the Supreme Court in *U.S. v. Rahimi*, the government agreed that "dangerousness" disqualifiers should be left to legislative bodies, not licensing officers/the executive branch. https://www.supremecourt.gov/oral_arguments/audio/2023/22-915 at p. 12 (supporting a "legislative consensus that individuals in this category present the requisite level of danger"), p. 15 ("but I do think that legislatures are best positioned to make these kinds of predictive judgments about dangerousness"), p. 34 (noting the difficulties in "defend[ing] an executive branch or an administrative determination [of dangerousness] because of a separate Second Amendment principle that guards against granting executive officials too much discretion to decide who and who cannot have firearms").

[32] Nor did the police commissioner intend to limit the 'moral character' assessment to 'dangerousness' when amending the preamble to 38 RCNY 3-03 "Grounds for Denial." The amendments did not include removing from the list of enumerated factors events having no bearing on 'dangerousness' [compare A316, A317] like dismissed and sealed arrests, driving history, and non-criminal summonses, which were used to deny Srour's license applications in 2019) [A119; A124-26].

**A.  The Plain Text of the Second Amendment Forecloses Discretion**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

Interpreting the plain text, the Supreme Court was guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576.

The plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. It "has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right… and declares only that it 'shall not be infringed.'" *Id.* (emphasis supplied).

The term "Arms" applies to all weapons in common use for self-defense. *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns). Handguns, rifles, and shotguns are all weapons in common use for self-defense.

At the time of the Founding, the phrase "shall not be infringed" was understood to mean that the government shall not 'violate, break, or transgress'[33]

---

[33] Infringe: to violate, break, or transgress. *A Compendious Dictionary of the English Language: A Facsimile of the First Edition (1806)*, Noah Webster.

the right to possess and carry weapons in common use for self-defense. To the Founders, any 'intrusion' was a violation of a Natural right.

> Before a standing army can rule, the people must be disarmed; as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretence, raised in the United States.
>
> A military force, at the command of Congress, can execute no laws, but such as the people perceive to be just and constitutional; for they will possess the power, and jealousy will instantly inspire the inclination, to resist the execution of a law which appears to them unjust and oppressive.[34]

## B. The Supreme Court Has Never Looked to Post-1868 Regulations as A Primary Means of Interpreting the Constitution

When history must be consulted to determine meaning, it has been the universal practice of the Supreme Court to look at the Founding period and relevant antecedents to determine original public understanding; the Court has never looked to 1868 as the primary period for determining the meaning of provisions of the Bill of Rights, and its decisions generally do not even mention

---

[34] Noah Webster. "A Citizen of America: An Examination Into the Leading Principles of America". Essay, October 17, 1787. From Teaching American History. https://teachingamericanhistory.org/document/a-citizen-of-america-an-examination-into-the-leading-principles-of-america/ (accessed March 7, 2024). https://teachingamericanhistory.org/document/a-citizen-of-america-an-examination-into-the-leading-principles-of-america/

that period.[35, 36] If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791 [*Smith*, at A254-55].

It has been a fundamental principle of Bill of Rights jurisprudence that the Amendments have the same meaning and scope when invoked against the federal government as when they are invoked against state and local governments [*Smith*, at A257].

In *McDonald*, the Supreme Court "abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights, noting it would be incongruous to apply different standards "depending on whether the claim was asserted in a state or federal court." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765–66 (2010) (cleaned up) (citation omitted). Incorporated Bill of Rights protections "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.* citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380

---

[35] 'Not All History Is Created Equal': In the Post-*Bruen* World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868," Smith, Mark. W. (October 1, 2022) [A247, A307].

[36] Litigants in post-*Bruen* litigation have so far not pointed to a single Supreme Court case in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or meaning of a provision of the Bill of Rights [A307].

U.S. 400, 406 (1965); *Duncan v. State of La.*, 391 U.S. 145, 149, 157-58 (1968); *Benton v. Maryland*, 395 U.S. 784, 794-95 (1969); *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985).

### C. Post-Ratification History is Consulted to Confirm Founding Era Meaning; But the Plain Text of the Second Amendment 'Controls'

The scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. *Bruen*, 597 U.S. at 37 citing *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).

In interpreting the meaning of the plain text of the Second Amendment, the *Heller* Court looked to 19th-century evidence only "as mere confirmation of what the Court thought had already been established." *Bruen*, 597 U.S. at 37 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary").

*Heller* and *Bruen* recognized that post-Civil War discussions of the right to keep and bear arms that took place "75 years after the ratification of the Second Amendment…do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 37 quoting *Heller,* 554 U.S. at 614.

> And where post-ratification history contradicts what the plain text says, the text controls. *Bruen*, 597 U.S. at 37.

*Bruen* mandates the rejection of post-ratification regulations that are inconsistent with the plain text of the Second Amendment. *Bruen*, 597 U.S. at 37. Liquidating indeterminacies in written laws is far removed from expanding or altering them. *Id.* (citations omitted). Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. *Id.* quoting *Heller v. D.C.*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

### D.  The Exercise of Subjective Discretion Over Second Amendment Conduct Contradicts the Plain Text and Natural Law

The Natural Right of self-protection is protected by the Second Amendment.

> The right to self defence is the first law of nature: in most governments it has been the study of rulers to confine the right within the narrowest limits possible. *Heller,* 554 U.S. at 606.

*Heller* confirmed that the Second Amendment codified a *pre-existing* right. "As we said in *United States v. Cruikshank*… "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its

43

existence. The second amendment declares that it shall not be infringed ...." *Heller*, 554 U.S. at 592 quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1876).

It is well-settled by a 'long line' Supreme Court decisions that "an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969).

Conditioning the right to keep and bear arms for self-protection on the subjective assessment of a government official is repugnant to the plain text of the Second Amendment, and this Nation's historical tradition.

### E. *Bruen* Rejected Discretionary Assessments

The issue in *Bruen* was narrow: whether New York's "proper cause" requirement violated the Second Amendment. *Bruen* did not, and was not asked to, decide whether a licensing requirement itself violates the Second Amendment.

It was in the context of considering the constitutionality of "proper cause" that the Supreme Court made the distinction between objective and subjective licensing factors by pointing out the 6 outlier states, including New York, with a "may issue" licensing regime. *Bruen* went on to hold that licensing regimes that

44

vest discretion in state or local officials, instead of being based on objective criteria, are unconstitutional [*Smith*, at A252, n. 7].

Licensing regimes that require the "appraisal of facts, the exercise of judgment, and the formation of an opinion -- features that typify proper-cause standards like New York's" violate the Second Amendment, whereas those that contain only "narrow, objective, and definite standards" guiding licensing officials do not. *Bruen*, 597 U.S. at 38 n. 9. The majority went on to caution that, "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*[37]

The City's "moral character" assessment is a discretionary, subjective conclusion dependent on an "appraisal of facts, the exercise of judgment, and the formation of an opinion" – just like the State's stricken "proper cause" requirement.

What's more, subjective moral character assessments are made by licensing officers on a case-by-case basis, whereas objective eligibility factors enacted by

---

[37] The Supreme Court's nod toward shall-issue regimes was to illustrate its approval of objective factors, and rejection of subjective, discretionary assessments. The Court did not conduct the 'deep dive' into every shall-issue licensing regime that *Antonyuk* relies on to justify the same type of "appraisal of facts, the exercise of judgment, and the formation of an opinion" flatly rejected in *Bruen*. See, e.g., *Antonyuk*, at 324 (rejecting the plaintiffs' reliance on *Bruen*'s instruction as an "overreading of one footnote in *Bruen*" citing *Bruen*, 597 U.S. at 38 n. 9).

Congress and state legislatures are bright-line disqualifiers that apply to the People equally. That said, even objective disqualifiers are subject to the text, history, and tradition test under *Bruen*.

## VII. THE CITY'S BALANCING OF 'COMPELLING PUBLIC INTERESTS' FLOUTS SUPREME COURT PRECEDENT

The City continues to ignore Supreme Court precedent in its plea for the Court to balance Srour's individual rights against "compelling public interests" and "threat[s] to undermine public safety" – standards patently rejected by *Heller, McDonald, Caetano*, and *Bruen* [City Br. at 20-21].

"Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny. Moreover, *Heller* and *McDonald* expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 597 U.S. at 22 quoting *Heller,* 554 U.S. at 634.

The City's 'balancing' argument must be rejected.

## CONCLUSION

New York City's appeal should be dismissed, the decision and order appealed from should be affirmed in its entirety, and the stay of the district court order permanently enjoining New York City Administrative Code § 10-303(a)(2) should be vacated.

Dated: March 13, 2024

Respectfully submitted,

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellee*

By: _Amy L. Bellantoni_
Amy L. Bellantoni
2 Overhill Road, Suite 400
Scarsdale, New York 10583

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). It contains 10, 788 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated:  March 13, 2024

APPENDIX

13

hibited by state law; it is criminal, however, under the Federal Fire-arms Act (15 U. S. C. § 902(c) ) to make such shipments to an unlicensed person in a state that requires a license.

With respect to rifles and shotguns, New York along with a significant number of jurisdictions, prohibit possession by minors under sixteen and aliens. But for other well-defined categories of persons, New York does not extend this prohibition, as many other states do in the case of persons convicted of felonies or crimes of violence (Alabama, Arizona, California, Georgia, Hawaii, Massachusetts, North Dakota), persons who are insane or incompetent (Georgia), drug addicts or peddlers (Alabama, California, Hawaii, Massachusetts, North Dakota) and even habitual drunkards (Alabama, North Dakota). In these fifty-one American jurisdictions, provisions for licensing or registering rifles or shotguns are virtually non-existent. Under a unique provision, one state (Florida) requires a license for a certain type of rifle described as a Winchester or repeating rifle. In another state (Hawaii), in the unlikely case of a rifle or shotgun with barrel less than eighteen inches in length, a license is required. In New York, any sawed-off shotgun is flatly outlawed.

The estimate of twenty to forty million rifles and shotguns in the hands of the civilian population of the United States is entirely credible. In recent years, hundreds of thousands of military rifles have been imported from Europe, with the *pro forma* approval of the United States Department of State. Thousands of other such rifles have been released by the Department of Defense. By statute since 1927 (18 U. S. C. § 1715), pistols and revolvers have been declared nonmailable with certain exceptions, but the Post Office Department accepts rifles and shotguns in the mails. Under the Federal Firearms Act (15 U. S. C. § § 901–909), such shipments are prohibited to convicts, persons under indictment and fugitives from justice in other states, but the statute appears to be complied with by any signature that the purchaser is not a convict, under indictment or a fugitive. States surrounding New York have no restrictions, except those already pointed out, on rifles and shotguns. Under these circumstances, any proposal to register rifles and shotguns in the single State of New York would not only impose a governmental burden of Augean proportions but also would in all probability not prevent their possession by persons dangerously likely to use them in the commission of crimes.

Law enforcement officials have often expressed the belief that more consistent enforcement of adequate statutes governing firearms and weapons would reduce the incidence of certain serious crimes (*Role of the Police,* IACP Committee on Juvenile Delinquency p. 15; *New York Times,* September 12, 1956, p. 1). Yet this enforcement has yet to come to pass. Although the rate per 100,000 population in the United States for serious crimes committed with weapons is estimated for 1962 at 130.8, the rate of arrests for violations of weapons laws is only 35.1.