# 23-7549

## United States Court of Appeals for the Second Circuit

◆

JOSEPH SROUR,

*Plaintiff-Appellee,*

*against*

NEW YORK CITY, NEW YORK, AND EDWARD A. CABAN,

*Defendants-Appellants,*

KEECHANT SEWELL, in her Official Capacity as NYPD Police Commissioner,

*Defendant.*

◆

On Appeal from the United States District Court
for the Southern District of New York

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION
AND FPC ACTION FOUNDATION IN SUPPORT OF
PLAINTIFF-APPELLEE**

◆

JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

Firearms Policy Coalition has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

FPC Action Foundation has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES.................................................... iii

STATEMENT OF *AMICI CURIAE* .........................................1

CONSENT TO FILE ...............................................................2

SUMMARY OF ARGUMENT ...................................................3

ARGUMENT ..........................................................................4

    I.    The Second Amendment's plain text covers the right to keep arms, so the government must justify its licensing scheme with historical regulations. ...............................................4

    II.   The only historical laws requiring a license to possess firearms were discriminatory. ........................................................5

        A.   Colonial Laws. ...........................................................5

        B.   Founding Era. .............................................................6

        C.   The 19th Century.........................................................9

        D.   Post-Civil War............................................................16

    III.  The racist historical licensing laws do not establish a tradition of firearm regulation. ................................................17

CONCLUSION ......................................................................19

CERTIFICATE OF COMPLIANCE.........................................21

CERTIFICATE OF SERVICE...................................................22

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Commonwealth*,
4 Va. 447 (1824) ............................................................ 7, 11, 19

*Antonyuk v. Chiumento*,
89 F.4th 271 (2d Cir. 2023) ................................................... 5

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................ 4, 6, 10

*Dred Scott v. Sandford*,
60 U.S. 393 (1857) ............................................................... 7

*Gamble v. United States*,
139 S. Ct. 1960 (2019) ........................................................ 16

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .................................................... 14, 15, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ....................................................... *passim*

*Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017) ............................................................ 18

*Ramos v. Louisiana*,
140 S. Ct. 1390 (2020) ........................................................ 18

*State v. Newsom*,
27 N.C. 250 (1844) ..................................................... 7, 12, 13, 19

**Constitutional Provisions**

U.S. CONST. amend. II ...................................................... *passim*

U.S. CONST. amend. XIV .......................................................... 16

## Statutes and Regulations

1822 Miss. Laws 182 ................................................................. 10

Freedmen's Bureau Act, 14 Stat. 173 (1866) .......................... 15

Civil Rights Act, 14 Stat. 27 (1866) ........................................ 15

Civil Rights Act, 17 Stat. 13 (1871) ........................................ 15

1893 Fla. Laws 71 .................................................................... 17

## Other Authorities

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE, vol. 1 (2d ed. 1814) ................................................... 8

A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE STATUTES OF A PUBLIC AND GENERAL NATURE IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY, 1833 (John G. Aikin ed., 1833) .............................. 10

A DIGEST OF THE STATUTE LAW OF KENTUCKY, vol. 2 (William Littell & Jacob Swigert eds., 1822) ....................................... 9

ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA PASSED AT THE SESSIONS OF 1864–65 (1866) ......................... 13

Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners, July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 .......... 18

Cramer, Clayton E., LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018) .......................................... 18

Geyer, Henry S., A DIGEST OF THE LAWS OF MISSOURI TERRITORY (1818) ................................................................................ 10

Gould, Josiah, A DIGEST OF THE STATUTES OF ARKANSAS; EMBRACING ALL LAWS OF A GENERAL AND PERMANENT

CHARACTER IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY OF 1856 (1858) .............................................. 12

Halbrook, Stephen P., THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS (2008) ...................................... 18

Iredell, James, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR 1846, INCLUSIVE (1847) .............................................................. 12

LAWS OF THE STATE OF DELAWARE, FROM THE SIXTEENTH DAY OF JANUARY, ONE THOUSAND EIGHT HUNDRED AND THIRTY, TO THE THIRTEENTH DAY OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED AND THIRTY-FIVE, vol. 8 (1841) ........................................... 11

LAWS OF THE STATE OF DELAWARE, FROM THE TWENTY-THIRD DAY OF JULY, ONE THOUSAND EIGHT HUNDRED AND THIRTY-FIVE, TO THE TWENTY-EIGHTH DAY OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED AND FORTY-THREE, vol. 9 (1843) ......................................... 11

LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865 (1866) ............................ 14

Shepherd, Samuel, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, vol. 3 (1836) ...... 9

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022) .......................................................... 7

THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION (1866) .................................. 14

THE COLONIAL RECORDS OF THE STATE OF GEORGIA (Allen D. Candler ed., 1904) .................................................................. 6

THE REVISED STATUTES OF THE STATE OF MISSOURI, REVISED AND DIGESTED BY THE EIGHTEENTH GENERAL ASSEMBLY, DURING THE SESSION OF ONE THOUSAND EIGHT HUNDRED

AND FIFTY-FOUR AND ONE THOUSAND EIGHT HUNDRED AND
FIFTY-FIVE, vol. 2 (Charles H. Hardin ed., 1856) ................................ 13

THE STATUTES AT LARGE OF SOUTH CAROLINA, vol. 7 (David J.
McCord ed., 1840) .................................................................................. 6

THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS
OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN
THE YEAR 1619, vol. 4 (William Waller Hening ed., 1820) ................... 6

Wells, Ida B., SOUTHERN HORRORS: LYNCH LAW IN ALL ITS PHASES
(1892) ...................................................................................................... 16

## STATEMENT OF *AMICI CURIAE*[1]

**Firearms Policy Coalition (FPC)** is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. Since its founding in 2014, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus curiae*.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to inform the public about the importance of constitutional rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund the preparation or submission of this brief. No person other than *Amici* and their members contributed money intended to fund the preparation or submission of this brief.

guaranteed by the Constitution are secured for future generations. FPCAF's research and *amicus curiae* briefs have been relied on by judges and advocates across the nation.

This case concerns *Amici* because it goes to the heart of the natural and fundamental right to armed self-defense.

## CONSENT TO FILE

All parties consented to the filing of this brief.

## SUMMARY OF ARGUMENT

Because the Second Amendment's plain text covers the right to possess firearms, the government must justify its licensing requirement for shotgun and rifle possession by demonstrating that it is consistent with our Nation's historical tradition of firearm regulation. Appellants cannot meet that burden here.

There is no historical tradition of requiring a license to possess a firearm. The only historical laws requiring a license to possess a firearm applied to persons without recognized rights at the time, namely African Americans and American Indians. These repugnant laws cannot form the historical tradition necessary for the government to satisfy its burden for several reasons.

First, by declining to rely on such laws itself, the Supreme Court has demonstrated that discriminatory laws cannot establish our historical tradition. Second, the challenged licensing scheme addresses societal problems that have persisted since the 18th century. The fact that many states applied licensing laws to disfavored noncitizens but never to "the people" indicates a recognition that such laws would violate the Constitution. Third, several historical sources suggest that requiring

3

a license to possess firearms would be unconstitutional if the requirement applied to individuals protected by the Second Amendment.

## ARGUMENT

I. **The Second Amendment's plain text covers the right to keep arms, so the government must justify its licensing scheme with historical regulations.**

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

The Supreme Court has established that the Second Amendment's "'textual elements' . . . 'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Id.* at 32 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). New York City burdens the right to possess weapons by requiring a license, and therefore must justify its licensing scheme with historical regulations.

## II. The only historical laws requiring a license to possess firearms were discriminatory.

This Court considered the tradition of licensing for the *carrying* of firearms in *Antonyuk v. Chiumento*, 89 F.4th 271, 317–20 (2d Cir. 2023), but that tradition is distinct from the tradition of licensing for the *possession* of firearms. The only pre-1900 laws that required a license to possess firearms applied to persons without recognized rights at the time, namely African Americans and American Indians. These repugnant laws cannot form the historical tradition necessary for the government to meet its burden under *Bruen*.

### A. Colonial Laws.

*Bruen* valued colonial laws to the extent that they informed the original public meaning of the Second Amendment. 571 U.S. at 46–49. While some licensing laws existed in colonial America, they were all overtly racist.

The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." 4 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE

5

LEGISLATURE, IN THE YEAR 1619, at 131 (William Waller Hening ed., 1820). An exception was provided, however, for "negroes, mullattos, or indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.*

In 1740 South Carolina, slaves could only "make use of fire arms" outside "the presence of some white person" if they acquired a "ticket or license, in writing, from his master, mistress, or overseer." 7 THE STATUTES AT LARGE OF SOUTH CAROLINA 404 (David J. McCord ed., 1840). Georgia copied the South Carolina law in 1755 and re-enacted it in 1768. THE COLONIAL RECORDS OF THE STATE OF GEORGIA 76–78, 117–18 (Allen D. Candler ed., 1904).

### B.    Founding Era.

"Not all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" Founding Era history is paramount. *Bruen*, 571 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35) (emphasis in *Bruen*); *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was*

6

*Adopted in 1791, Not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/3uGTcQg.

Founding Era licensing laws, like those from the colonial era, were discriminatory and never applied to free citizens. They applied only to slaves, freedmen, and Indians, who, at that time, were considered not to be among "the people" who were secured the right "to keep and bear Arms" through the Bill of Rights. U.S. Const. amend. II; *see, e.g.*, *Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824) ("the Bill of Rights . . . was not intended to apply to our slave population," and "free blacks and mulattoes were also not comprehended in it"); *State v. Newsom*, 27 N.C. 250, 254 (1844) ("free people of color cannot be considered as citizens"). Thus, St. George Tucker listed "to keep or carry a gun" among the "many actions" that African Americans had less freedom to engage in than whites. St. George Tucker, Dissertation on Slavery: With a Proposal for the Gradual Abolition of it, in the State of Virginia 63 (1796) (1861 reprint); *see also Bruen*, 597 U.S. at 60 (noting that the Court in *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857), "fretted" that "[i]f blacks were citizens . . . they would be

entitled . . . 'to keep and carry arms wherever they went.'") (emphasis omitted).

A 1792 Virginia law provided that "[n]o negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive," with the exception that "every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves." 1 A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE 263 (2d ed. 1814).

Kentucky enacted a similar law in 1798, providing that "[n]o negro, mulatto, or Indian, whatsoever, shall keep or carry any gun," except that "every free negro, mulatto or Indian, being a house-keeper, may be permitted to keep one gun," and "all negroes, mulattoes and Indians, bond or free, living at any frontier plantation, may be permitted to keep

and use guns . . . by license from a justice of the peace." 2 A DIGEST OF THE STATUTE LAW OF KENTUCKY 1150 (William Littell & Jacob Swigert eds., 1822).

### C.   The 19th Century.

While the *Bruen* Court examined later history, the Court cautioned "against giving postenactment history more weight than it can rightly bear," 597 U.S. at 35, and emphasized that "to the extent later history contradicts what the text says, the text controls," *id.* at 36.

Continuing the Founding Era tradition of discriminatory licensing schemes, in 1806, Virginia required every "free negro or mulatto" to first "obtain[] a license from the court of the county or corporation in which he resides" before keeping "any fire-lock of any kind, any military weapon, or any powder or lead." 3 Samuel Shepherd, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, at 274 (1836).

The Missouri Territory enacted a law in 1818 that forbade any "slave or mulatto" to "keep or carry a gun, powder, shot, club or other weapon," with the exception of "housekeeper[s]" as well as "negroes or mulattoes bond or free, living at any frontier plantation" who obtained a

9

"license from a justice of the peace." Henry S. Geyer, A DIGEST OF THE LAWS OF MISSOURI TERRITORY 374 (1818).

An 1822 Mississippi law provided that "any justice of the peace may grant, in his proper county, permission in writing to any slave, on the application of his master, employer or overseer, to carry and use a gun and ammunition, within the limits of the land or plantation of his master, employer or overseer, for a term not exceeding one year." 1822 Miss. Laws 182. A nearly identical law was in force in Alabama by 1833. A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE STATUTES OF A PUBLIC AND GENERAL NATURE IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY, 1833, at 392 (John G. Aikin ed., 1833).

Soon after Mississippi enacted its 1822 law, as *Heller* noted, "[a] Virginia case in 1824 [held] that the Constitution did not extend to free blacks." 554 U.S. at 611. The Virginia court explained:

> Notwithstanding the general terms used in the Bill of Rights, it is undeniable that it never was contemplated, or considered, to extend to the whole population of the State. Can it be doubted, that it not only was not intended to apply to our slave population, but that the free blacks and mulattoes were also not comprehended in it? . . . The numerous restrictions imposed on this class of people in our Statute Book, many of which are inconsistent with the letter and spirit of the

10

Constitution, both of this State and of the United States, as respects the free whites, demonstrate, that, here, those instruments have not been considered to extend equally to both classes of our population. We will only instance the restriction upon the migration of free blacks into this State, and upon their right to bear arms.

*Aldridge*, 4 Va. at 449.

Delaware established the most elaborate licensing law to date in 1832. A "free negro or free mulatto" could "have use and keep in his possession a gun or fowling piece" if "one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun." 8 LAWS OF THE STATE OF DELAWARE 208 (1841). Nearly a decade later, Delaware began charging "twenty-five cents" for "licenses to negroes to keep a gun." 9 LAWS OF THE STATE OF DELAWARE 430 (1843). But in 1843, Delaware repealed the licensing law altogether. *Id.* at 552.

An 1838 Arkansas statute provided that "[n]o free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose,

11

from some justice of the peace of the county in which such free negro or mulatto resides." Josiah Gould, A DIGEST OF THE STATUTES OF ARKANSAS; EMBRACING ALL LAWS OF A GENERAL AND PERMANENT CHARACTER IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY OF 1856, at 557 (1858).

A few years later, in 1841, North Carolina required "any free negro, mulatto, or free person of color" to "obtain[] a license . . . from the Court of Pleas and Quarter Sessions of his or her county" in order to "keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife." James Iredell, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR 1846, INCLUSIVE 73 (1847). In 1844, the Supreme Court of North Carolina upheld a licensing requirement for free African Americans to carry arms because "the white men of the country are exempt" from the licensing law and "free people of color" are treated "as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation." *Newsom*, 27 N.C. at 252. Thus, the court concluded,

"free people of color cannot be considered as citizens" and therefore do not have constitutional rights. *Id.* at 254.[2]

An 1845 Missouri law stated that "[n]o free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace." 2 THE REVISED STATUTES OF THE STATE OF MISSOURI, REVISED AND DIGESTED BY THE EIGHTEENTH GENERAL ASSEMBLY, DURING THE SESSION OF ONE THOUSAND EIGHT HUNDRED AND FIFTY-FOUR AND ONE THOUSAND EIGHT HUNDRED AND FIFTY-FIVE 1094 (Charles H. Hardin ed., 1856).

After the Civil War, southern states continued to use licensing laws to discriminate against African Americans. For example, under South Carolina's 1865 law, no African American could, "without permission in writing from the District Judge or Magistrate, be allowed to keep a fire arm." ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA PASSED AT THE SESSIONS OF 1864–65, at 275 (1866). Florida's 1865 law

---

[2] One year prior, a Maryland court noted that free African Americans were "treated as a vicious or dangerous population" in Maryland and thus "laws have been passed to prevent their migration to this State," including restrictions that "make it unlawful for them to bear arms." *Waters v. State*, 1 Gill 302, 309 (Md. 1843).

provided that "it shall not be lawful for any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any . . . fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate" based on "the recommendation of two respectable citizens of the county certifying the peaceful and orderly character of the applicant." THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION 25 (1866). And Mississippi's 1865 law stated that "no freedman, free negro or mulatto . . . shall keep or carry fire-arms," unless "licensed so to do by the board of police." LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865, at 165 (1866).

In *McDonald v. City of Chicago*, the Supreme Court pointed to the licensing laws from Florida and Mississippi as examples of the "systematic efforts" of "the States of the old Confederacy" to "disarm . . . blacks." 561 U.S. 742, 771 (2010); *see also Bruen*, 571 U.S. at 60 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted.").

14

Indeed, the Mississippi law was highlighted in General Ulysses S. Grant's 1866 report arguing for a continued federal military presence in the South, which was presented to the United States Congress. Grant's report included a report by Brevet Major General Thomas Wood, who complained that "[t]he [Mississippi] statute prohibiting the colored people from bearing arms, without a special license, is unjust, oppressive, and unconstitutional." MESSAGE OF THE PRESIDENT OF THE UNITED STATES, AND ACCOMPANYING DOCUMENTS, TO THE TWO HOUSES OF CONGRESS, AT THE COMMENCEMENT OF THE THIRTY-NINTH CONGRESS 56 (1866).

Soon, the federal government acted against such laws. Congress passed the Freedmen's Bureau Act of 1866, which secured to all persons the "full and equal benefit of all laws and proceedings for the security of person and estate including the constitutional right of bearing arms." 14 Stat. 173, 176–77 (1866). "The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms." *McDonald*, 561 U.S. at 774. The Civil Rights Act of 1871, and most

importantly, the Fourteenth Amendment, served the same purpose. *Id.* at 776–78.

### D. Post-Civil War.

*Bruen* deemed late-19th-century evidence relevant only to the extent that it provided "confirmation of what . . . had already been established" by earlier history. 571 U.S. at 37 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). The Court was clear that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66. In fact, the Court did not even bother to "address any of the 20th-century historical evidence." *Id.* at 66 n.28.

After the federal government cracked down on explicitly racist licensing laws, Florida enacted a facially neutral—but discriminatorily applied—licensing law in 1893. The year after Ida B. Wells wrote that a "Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give," Ida B. Wells, SOUTHERN HORRORS: LYNCH LAW IN ALL ITS PHASES 16 (1892), Florida made it "unlawful to carry or own a Winchester or other repeating rifle . . . without first taking out a license from the County

Commissioners." 1893 Fla. Laws 71. As Florida Supreme Court Justice Rivers H. Buford later explained, the licensing law "was passed . . . for the purpose of disarming the negro laborers" in the state and "was never intended to be applied to the white population." *Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J., concurring). Justice Buford noted that "there had never been any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested." *Id.*

## III. The racist historical licensing laws do not establish a tradition of firearm regulation.

*Bruen* makes clear that the history of racist licensing laws presented above does not establish a tradition of firearm regulation that can justify New York City's licensing scheme.

First, *Bruen* makes clear that discriminatory laws cannot establish our historical tradition. The *Bruen* Court did not consider any historical laws requiring African Americans to acquire discretionary carry licenses to carry arms when analyzing New York's discretionary licensing law for carrying arms—and many were presented to the Court. *See, e.g.*, Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners at 4–11, July 16, 2021, *New York State Rifle &*

17

*Pistol Ass'n, Inc. v. Bruen*, No. 20-843. Rather, the Supreme Court "has emphasized time and again the 'imperative to purge racial prejudice from the administration of justice.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1418 (2020) (Kavanaugh, J., concurring) (quoting *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 221 (2017)).

Second, *Bruen* explained that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. Firearm crime and accidents were certainly well-known problems in 18th- and 19th-century America. *See* Clayton E. Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE 111–18 (2018) (discussing crime); Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 19 (2008) (discussing accidents). The fact that many states applied licensing laws to disfavored noncitizens but never to free Americans indicates a recognition that such laws would violate the Constitution.

18

Third, *Bruen* stated that if similar proposals to the challenged law "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 597 U.S. at 27. While no historical source suggests that requiring a license to keep arms would be constitutional, several suggest that it would not. *Newsom* and *Aldridge* were decided on the basis that African Americans were not protected by the Second Amendment, General Grant's report called Mississippi's licensing law "unjust, oppressive, and unconstitutional," MESSAGE OF THE PRESIDENT OF THE UNITED STATES, at 56, and Justice Buford stated that Florida's licensing law "has been generally conceded to be in contravention of the Constitution and non-enforceable if contested," *Watson*, 148 Fla. at 524 (Buford, J., concurring).

## CONCLUSION

A licensing scheme for firearms possession contradicts our Nation's tradition of firearm regulation and thus violates the Second Amendment. For this reason and those stated by Appellee, the district court's decision should be affirmed.

19

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 3,664 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 20, 2024, I served the foregoing with the Clerk of the Court using the ACMS System, which will send notice of such filing to all registered ACMS users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*